[Cite as *State v. Taylor*, 2026-Ohio-2497.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 25AP-201 (C.P.C. No. 22CR-5827) |
| v. | : | (REGULAR CALENDAR) |
| Tayvion Taylor, | : | No. 25AP-204 (C.P.C. No. 23CR-1259) |
| Defendant-Appellant. | : | |
| | : | (REGULAR CALENDAR) |
| | : | |

D E C I S I O N

Rendered on June 30, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Mark R. Wilson*, for appellee.

**On brief:** *Wolfe Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

APPEALS from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Following a jury trial on his two consolidated cases, defendant-appellant, Tayvion Taylor, was found guilty of a number of offenses and associated firearm specifications. He was sentenced under both case numbers to an aggregate prison sentence of 17 to 22 and one-half years. On appeal, Mr. Taylor argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} On December 12, 2022, a Franklin County Grand Jury returned a three-count indictment under Franklin C.P. case No. 22CR-5827 charging Mr. Taylor with three counts of tampering with evidence, each a third-degree felony in violation of R.C. 2921.12. Firearm

specifications were included with all three counts. On March 15, 2023, a second indictment was issued in Franklin C.P. case No. 23CR-1259, charging Mr. Taylor with (1) one count of trafficking in a fentanyl-related compound, a first-degree felony in violation of R.C. 2925.03, with associated firearm specifications, (2) one count of possession of a fentanyl-related compound, a first-degree felony in violation of R.C. 2925.11, with associated firearm specifications, (3) one count of trafficking in cocaine, a first-degree felony in violation of R.C. 2925.03, with associated firearm specifications, (4) one count of possession of cocaine, a first-degree felony in violation of R.C. 2925.11, with associated firearm specifications, and (5) two counts of unlawful possession of a dangerous ordnance, both fifth-degree felonies in violation of R.C. 2923.17, with associated firearm specifications.

{¶ 3} These offenses arose from an incident that occurred on the evening of October 7, 2022, when an Uber driver and his two passengers were shot at while driving on the I-71 highway near the Crowne Plaza Hotel in Columbus, Ohio. Evidence presented at Mr. Taylor's September 2024 trial established Uber driver Ramon Berroa was driving on the interstate with two passengers that evening—Mr. Taylor and Sharone Coleman—when the vehicle was shot at by unknown individuals. Both Mr. Berroa and Mr. Coleman were hit and sustained injuries from the incident. Following the shooting, the vehicle came to a stop and both passengers exited. What occurred after the vehicle came to a stop and Mr. Taylor and Mr. Coleman exited was largely the subject of Mr. Taylor's trial.

{¶ 4} The state called 11 witnesses at trial, including lay witnesses Kristine Gordon, Gail Schaffer, and Angel Barhorst, who each testified that they were staying at the Crowne Plaza Hotel near the highway to attend an AMVETS convention. All three observed at least part of the incident giving rise to Mr. Taylor's charges and testified about what they saw that evening.

{¶ 5} Ms. Gordon testified that, while sitting outside the hotel, she heard "a couple of pops," causing her to stand up and look around. (Sept. 24, 2024 Tr. Vol. II at 289.) She described being able to see out to the highway, where traffic had come to a standstill. As she looked in that direction, she saw two people walk "about a quarter of the way down" the hill next to the highway. (Tr. Vol. II at 290.) She saw a person wearing white "kind of sat down in the grass" and another person dressed in blue continued walking to a fence next to the highway. (Tr. Vol. II at 290, 292.) She testified that "it looked like they threw something over the fence." (Tr. Vol. II at 290.) After throwing something over the fence, the individual

in blue went back up the hill, retrieved something from the person in white, headed back toward the highway, and it once again "looked like they kind of threw something out." (Tr. Vol. II at 291.) Although Ms. Gordon could not see clearly enough to determine whether the second person was male or female,[1] to identify the race of the individual (Tr. Vol. II at 304), or to make an in-court identification (Tr. Vol. II at 293, 298), she repeatedly described the individual as having long, dark hair and wearing a long, blue coat. (*See* Tr. Vol. II at 293, 294, 298.) She did not see any other person walk up to the fence. (Tr. Vol. II at 299.)

{¶ 6} Ms. Schaffer testified that she was also outside the hotel when she heard what "sounded like firecrackers." (Sept. 25, 2024 Tr. Vol. III at 336, 342.) She stood up to get a better look and saw "somebody sitting on the ground, and then [she] saw someone else come down the hill" near the highway. (Tr. Vol. III at 342.) She testified that the person sitting down was wearing a white t-shirt, but she was too far away "to see anything else, to actually make out that person." (Tr. Vol. III at 343-44). The other person she saw walking down the hill near the highway was wearing a "blue or dark jacket" and "[m]aybe a hoodie or hat." (Tr. Vol. III at 345.) Although it was still light outside, she could not identify any facial or other features[2] of the second individual (Tr. Vol. III at 359), and, like Ms. Gordon, Ms. Schaffer indicated she would not be able to recognize that person if she saw him again (Tr. Vol. III at 346). She watched as the person in blue "[t]hrew something over the fence" and "[w]ent back up the hill." (Tr. Vol. III at 345.) At that point, she returned inside the hotel. (Tr. Vol. III at 345.)

{¶ 7} Ms. Barhorst provided similar testimony regarding the identities of the Uber passengers. She had just returned to her room on the ground floor of the hotel, on the side closest to the highway, when she heard what "sounded like gunshots." (Sept. 26, 2024 Tr. Vol. IV at 553.) She left her room and saw two cars stopped in the middle of the highway. (Tr. Vol. IV at 553-54.) She described seeing two men emerge from the passenger side of one of the cars. (Tr. Vol. IV at 555-56.) One appeared to be wearing a white hoodie, had blood on his clothes, "mostly stumbled out of the car[,] came halfway down the hill[,] and . . . fell." (Tr. Vol. IV at 556.) The other person was wearing a blue sweatshirt, ran partly

---

[1] On cross-examination, Ms. Gordon was questioned about a statement she made to law enforcement five days after the incident. Although she did not initially recall having identified the person in blue as a woman, she ultimately acknowledged having made that statement. (Tr. Vol. II at 314-15.)

[2] Ms. Schaffer did, however, tell the police she believed the second individual was Caucasian when she spoke with them five days after the incident. (Tr. Vol. III at 360.)

down the hill, came back up to the car, grabbed an item, and threw it on the other side of the fence. (Tr. Vol. IV at 557-59.) Before law enforcement arrived, Ms. Barhorst walked over to the area where she believed items were thrown and found two firearms in the grass. (Tr. Vol. IV at 561.) She later described this location to law enforcement. (*Id.*) She also testified to seeing the man in blue speaking with law enforcement and getting placed in the back of a police cruiser. (Tr. Vol. IV at 560, 574.) Although she did not get a good enough look to recognize and identify that person if she were to see him again (Tr. Vol. IV at 568), she was able to confirm that the man in blue who she saw throwing items was the same person who was seated in the back of the police cruiser. (Tr. Vol. IV at 560.)

{¶ 8} The state also presented the testimony of various law enforcement officers. Sergeant Aaron Napoli of the Columbus Police Department ("CPD") testified that he was one of the first officers on the scene. He described "a crowd of people over by the fence line" waving him down when he arrived. (Tr. Vol. III at 372.) Sergeant Napoli was wearing a bodycam that evening, footage from which was played for the jury and documented a conversation he had with Ms. Barhorst. During that conversation, Ms. Barhorst described watching a man dressed in blue throw something over a fence and identified that individual as the person who was sitting in the back of a police cruiser. (Tr. Vol. III at 411.) After speaking with Ms. Barhorst, Sergeant Napoli walked over to the identified area adjacent to the fence and located two firearms. (Tr. Vol. III at 416-17.)

{¶ 9} CPD Officer Gary Cooper testified that a baggie with suspected blood on the outside containing an unknown white substance was also discovered in the area along the fence. (Tr. Vol. III at 444, 487.) He testified about swabbing the two firearms for DNA but not taking fingerprints or conducting gunshot residue testing. (Tr. Vol. III at 454-55, 489.) He also testified about the items discovered in the rear of the Uber vehicle, including a .40-caliber gun magazine with 11 live rounds of .40-caliber ammunition and a digital scale. (Tr. Vol. III at 474-77.)

{¶ 10} Forensic scientist Colleen Hague testified about the DNA analysis she conducted for this case. She stated some items recovered from the scene had insufficient DNA for testing, but others had enough DNA to produce results. A GLOCK 26 magazine discovered in the area near the fence had a mixture of DNA from two individuals. (Tr. Vol. IV at 622-23.) Ms. Hague testified that Mr. Taylor and Mr. Coleman could be excluded as the major contributor for that DNA profile, but she was unable to run the DNA sample for

the minor contributor. (Tr. Vol. IV at 623.) A GLOCK 23 grip similarly had a mixture of DNA from two individuals. Ms. Hague testified that Mr. Coleman could not be excluded as the major contributor for that profile. (Tr. Vol. IV at 630 ("Based on these results, it's at least 3.15 quadrillion times more likely if Sharone Coleman is a contributor than if this were a mixture of two unknown unrelated individuals.").) Like the magazine, the minor contributor DNA sample was insufficient in quantity to analyze. (Tr. Vol. IV at 631-32.) Ms. Hague tested the DNA from blood found on the baggie containing the white substance and reached a conclusion that Mr. Taylor could be excluded as the contributor but there was a significant likelihood that Mr. Coleman was the contributor. (Tr. Vol. IV at 642 ("at least 750 nonillion times more likely if the evidentiary profile originated from Sharone Coleman than if it originated from an unknown unrelated individual").)

{¶ 11} Another CPD forensic scientist testified regarding the contents of the plastic baggie discovered in the area near the fence. Reagan Anderson noted the larger bag contained multiple smaller baggies. (Sept. 27, 2024 Tr. Vol. V at 688.) He tested the substances in each of the smaller baggies and found the following: one bag contained approximately 22.440 grams of a substance containing fentanyl, tramadol, and cocaine; another bag contained approximately 16.305 grams of fentanyl; and a partial plastic bag contained approximately 6.316 grams of fentanyl. (Tr. Vol. V at 688-93.)

{¶ 12} After the state rested its case, Mr. Taylor's trial counsel made a Crim.R. 29 motion for judgment of acquittal, which was overruled by the trial court. (Tr. Vol. V at 707-09.) The jury returned a verdict on September 30, 2024, finding Mr. Taylor guilty of all counts and associated firearm specifications. On January 14, 2025, the trial court sentenced Mr. Taylor under both case numbers to an aggregate prison sentence of 17 to 22 and one-half years.

{¶ 13} Mr. Taylor now appeals and raises the following two assignments of error for our review:

> [I.] THE CONVICTIONS WERE NOT SUPPOSRTED BY SUFFICIENT EVIDENCE[.]
>
> [II.] THE VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

## II.  ANALYSIS

{¶ 14}  In his first assignment of error, Mr. Taylor challenges the sufficiency of the evidence supporting his convictions.  Specifically, he asserts the evidence presented at trial was insufficient to identify him as the person involved in the offenses.  And in his second assignment of error, Mr. Taylor makes the same assertion regarding his identity under a manifest-weight-of-the-evidence argument.  For the following reasons, we overrule both assignments of error.

### A.  Legal Standards

{¶ 15}  Whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.  *See, e.g., State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.); *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 16}  In evaluating a sufficiency challenge, we assume the state's witnesses testified truthfully and determine whether that testimony and any other evidence presented at trial satisfied each element of the offenses.  *See State v. Magan*, 2026-Ohio-1466, ¶ 25 (10th Dist.), citing *State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.).  Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt.  *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 17}  In contrast to a sufficiency-of-the-evidence challenge, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion.  *See, e.g., State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87.  "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.).  " '[W]eight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other.' "

*State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), quoting *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at 387.

{¶ 18} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 2022-Ohio-4175, ¶ 26. "In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Brefford*, 2025-Ohio-4436, ¶ 82 (10th Dist.), citing *Sparre v. Ohio Dept. of Transp.*, 2013-Ohio-4153, ¶ 10 (10th Dist.); *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 19} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g., Brefford* at ¶ 83; *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 20} A defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented." *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.). *See also State v. J.E.C.*, 2013-Ohio-1909, ¶ 42 (10th Dist.). It is well-established that " '[t]he finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062, at ¶ 63 (10th Dist.), quoting *State v. Mullins*, 2016-Ohio-8347, ¶ 39 (10th Dist.). *See also State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. May 28, 1996) (" 'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly,* * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' "). Thus, " 'where a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of

witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding . . . as being against the manifest weight of the evidence.' " *In re L.J.*, 2012-Ohio-1414, ¶ 21 (10th Dist.), quoting *In re Johnson*, 2005-Ohio-4389, ¶ 26 (10th Dist.).

{¶ 21}  To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution.  *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins*, 78 Ohio St.3d at paragraph four of the syllabus.

{¶ 22}  " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis.' " *In re T.W.*, 2024-Ohio-4697, ¶ 40 (10th Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Therefore, "a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Knight*, 2016-Ohio-8134, ¶ 36 (10th Dist.).  For that reason, we address Mr. Taylor's assignments of error out of order.

{¶ 23}  In his second assignment of error, Mr. Taylor challenges the manifest weight of the evidence presented at trial, specifically arguing the jury had to engage in impermissible inference-stacking to reach a conclusion that Mr. Taylor was the person who threw the firearms and drugs over the fence.  Mr. Taylor also argues the evidence did not support a conclusion that he threw the firearms and drugs because no witnesses were able to identify Mr. Taylor and none of his DNA was found on the relevant items.  (*See* Appellant's Brief at 7-10.)

{¶ 24}  Our review of the entire record shows the weight of the evidence supports Mr. Taylor's convictions.  Although none of the state's lay witnesses identified Mr. Taylor in the courtroom and each witness indicated she would not be able to recognize the man in blue if they were to see him again, all three consistently testified that the individual they saw throwing items over the fence was one of the two passengers from the stopped vehicle and wore blue that night.  (*See, e.g.*, Tr. Vol. II at 290-94, 298-99; Tr. Vol. III at 342-46, 359-60; Tr. Vol. IV at 554-61.)  Only two passengers emerged from the Uber vehicle—one person was wearing white and walked only a few steps before sitting down in the grass and the other person dressed in blue walked back and forth to throw items over the fence.  And, Ms. Barhorst pointed to the person who was later identified as Mr. Taylor sitting in a police

cruiser, noting he was the person she saw throwing items over the fence. (Tr. Vol. IV at 560, 574.)

{¶ 25} No impermissible inference-stacking is required in this case. Although the three lay witnesses were unable to identify from far away what items were thrown (and one was unsure whether items were thrown at all), they each consistently testified to seeing the Uber passenger dressed in blue engage in what looked like a throwing motion at the location where the firearms and drugs were discovered.

{¶ 26} With respect to the DNA evidence, although Mr. Taylor was excluded as the major contributor to the DNA mixtures on all of the items Ms. Hague was able to test, her results did not eliminate Mr. Taylor as a possible minor contributor. (Tr. Vol. IV at 648.) While Ms. Hague testified regarding the extraordinary likelihood that Mr. Coleman contributed to the DNA mixtures found on some of the tested items, many of the results were inconclusive. The presence of Mr. Coleman's DNA did not establish anything meaningful about Mr. Taylor's handling of the items and did not contradict the lay witness testimony indicating the person in blue, later identified as Mr. Taylor, walked back and forth to retrieve items and throw them over the fence. (*See, e.g.*, Tr. Vol. IV at 650.)

{¶ 27} Considering the totality of the evidence, we conclude it was reasonable for the jury to find Mr. Taylor was the person dressed in blue on October 7, 2022, and that he threw firearms and drugs over the fence adjacent to the highway. As such, we do not find Mr. Taylor's convictions are against the manifest weight of the evidence. Accordingly, Mr. Taylor's second assignment of error is overruled.

{¶ 28} As stated above, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *See State v. Smith*, 2018-Ohio-1937, ¶ 16 (10th Dist.), citing *McCrary*, 2011-Ohio-3161, at ¶ 11 (10th Dist.). Therefore, we also overrule Mr. Taylor's first assignment of error challenging the sufficiency of the evidence supporting his convictions.

## III. CONCLUSION

{¶ 29} Having overruled Mr. Taylor's two assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

DORRIAN and JAMISON, JJ., concur.

_____